<u>NOT FOR PUBLICATION</u>

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF OKLAHOMA**

Filed / Docketed
February 17, 2009

|  |  |  |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| **SCHUETTE, FRANK ROBERT,** | ) | **Case No. 02-03376-R** |
| | ) | **Chapter 7** |
| Debtor. | ) | |

|  |  |  |
|---|---|---|
| **FRANK ROBERT SCHUETTE,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **Adv. No. 07-1067-R** |
| | ) | |
| **NATIONAL LOAN ACQUISITIONS** | ) | |
| **CORP.,** | ) | |
| | ) | |
| Defendant. | ) | |

<u>MEMORANDUM OPINION</u>

In this proceeding, Plaintiff Frank Robert Schuette ("Mr. Schuette") objects to the allowance of the Proof of Claim filed by Defendant National Loan Acquisitions Corp. ("National"), asserting that the judgment which forms the basis of National's claim has been satisfied. A trial was held on December 16, 18 and 19, 2008, at which Mr. Schuette appeared in person and through his counsel, Timothy Janak, and National appeared through its counsel, Andrew Turner. A Pretrial Order was entered on December 15, 2008 (Adv. Doc. 71), which contains the parties' stipulations of fact and articulates the outstanding factual and legal issues to be resolved at trial. National submitted its Trial Brief on December 15, 2008 (Adv. Doc. 73), and Mr. Schuette submitted Plaintiff's Post-Trial Brief on January 11, 2009 (Adv. Doc. 81).

Upon consideration of the Pretrial Order, the testimony presented and documentary evidence admitted at trial, the briefs and oral arguments of counsel, and the applicable law, the Court finds and concludes as follows:

## I.      Jurisdiction

The Court has jurisdiction of this "core" proceeding by virtue of 28 U.S.C. §§ 1334, 157(a), and 157(b)(2)(B), (C), and (O); and Local Civil Rule 84.1(a) of the United States District Court for the Northern District of Oklahoma.

## II.     Procedural history

On July 15, 2002, Mr. Schuette filed his voluntary petition for relief under Chapter 7 of the Bankruptcy Code.  In his schedules, Mr. Schuette listed Bank of San Pedro/National Mortgage as a creditor holding a judgment in the amount of $1,200,000.00 (the "Judgment"). Mr. Schuette received a Chapter 7 discharge on October 22, 2002.  On December 10, 2003, the Chapter 7 Trustee (the "Trustee") determined that Mr. Schuette's non-exempt assets were not of sufficient value to justify liquidating them for the benefit of creditors.  The bankruptcy case was closed on April 8, 2004.

On August 14, 2006, the bankruptcy case was reopened upon application of the Trustee in order to administer an unscheduled asset, namely an inverse condemnation claim that arose in 1986, and for which Mr. Schuette received settlement proceeds in 2005 and 2006 (the "Settlement Proceeds").  The Trustee filed a notice of assets and the Court set a bar date for claims.[1]  On September 8, 2006, National timely filed a proof of claim in the amount

---

[1]On August 26, 2006, the Trustee filed an adversary proceeding against Mr. Schuette in order to recover the estate's interest in the Settlement Proceeds (Adv. No. 06-1217-R).

2

of $590,834.77 (the "Proof of Claim") (Defendant's Exhibit 2).  Attached to the Proof of Claim was an Assignment of Judgment, indicating that the Judgment originally granted to Bank of San Pedro had been assigned to National.  Also attached to the Proof of Claim was a schedule indicating credits applied against the principal and interest portions of the Judgment, as well a calculation of additional interest and other assessments, resulting in a principal balance due, as of October 27, 2000, of $493,982.26 plus accrued interest of $11,090.01, with interest accruing thereafter at $137.22 a day.

On May 24, 2007, Mr. Schuette filed an Adversary Complaint against National in which he (1) objected to the allowance of the Proof of Claim and (2) requested that National's claim be equitably subordinated to all other claims and interests due to the "unfair advantage" National sought to obtain through "inequitable conduct."

On September 14, 2007, Mr. Schuette filed in his main bankruptcy case a Declaration of Amendment to Schedule B–Personal Property and Schedule F–Creditors Holding Unsecured Non-Priority Claims (Main Case Doc. 95).  On the Amendment to Schedule B, Mr. Schuette added the following as an asset owned by him at the time he filed in 2002:

---

Prior to the reopening of the bankruptcy case, Mr. Schuette had reinvested most of the proceeds in real property.  On September 25, 2006, Mr. Schuette agreed to the entry of a restraining order enjoining Mr. Schuette from transferring or encumbering property traced to the Settlement Proceeds, as well as other property owned by Mr. Schuette, pending further order of the Court.  On October 30, 2007, the Court approved a settlement agreement between the Trustee and Mr. Schuette in which Mr. Schuette agreed to pay the Trustee one-half of the Settlement Proceeds, or $746,471.09 (an amount arguably sufficient to pay all outstanding claims, including National's claim, and all administrative expenses).  Mr. Schuette has been attempting to liquidate the real property that is subject to the restraining order, with the consent and assistance of the Trustee, in order to satisfy his obligation to the estate under his settlement with the Trustee.

Inverse condemnation lawsuit arising from 1986 Yuba River flood. At the time of the filing of the petition, this case had been twice tried to a jury, both of which returned defendant's verdicts. At the time of the filing of this case, Debtor had no reason to believe this claim had any value. Style of case: Lillian Abram, et al v. State of California, et al Coordinated Proceeding Special Title February 20, [1986] Linda Flood Cases, Coordinated Case No. 2104. 1,165 days later [after the filing of the petition], on or about September 15, 2005, Debtor received net settlement proceeds in which this Estate may have an interest in the amount of $820,740.52.

Amendment to Schedule B. On his Amendment to Schedule F, Mr. Schuette asserted that he disputed the Judgment entered in favor of Bank of San Pedro/National Mortgage.

On January 4, 2008, the Court dismissed Mr. Schuette's equitable subordination claim and required him to amend his Complaint. On January 17, 2008, Mr. Schuette filed his Amended Adversary Complaint (the "Complaint") (Adv. Doc. 25), seeking an order (1) requiring National to account for properties transferred by Mr. and/or Mrs. Schuette to National (or its affiliates) and (2) disallowing National's claim as either released or paid in full.

## III.     Contentions of the parties

Mr. Schuette contends that the amount of the Judgment has been significantly reduced or was satisfied because in the course of enforcing the Judgment, National obtained money and property from Mr. Schuette and his then-wife, Debora Schuette (who was a co-judgment-debtor) that equaled or exceeded the value of the Judgment. In the alternative, Mr. Schuette argues that National agreed that it would release the Judgment upon the Schuettes' transfer of certain property to National (or its affiliates).[2] National denies that such an agreement was

_____

[2]In order to limit its liability, National instructed Mrs. Schuette to convey the properties to a separate affiliated entity, CDW, LLC, rather than to National. CDW, LLC

made.  In any event, Mr. Schuette asserts that National has not adequately accounted for the value of the property surrendered to National in calculating the amount still owing on the Judgment.

National contends that it was generous in its calculation of the credit applied to the Judgment in exchange for the property in light of the poor condition of the property, the mortgages and other encumbrances on the property, and the repair and operating costs incurred by National in preparing the property for sale.  National also argues that Mr. Schuette should be barred from objecting to the Proof of Claim on grounds of prior admissions, the statute of frauds, unclean hands, laches, equitable estoppel, and/or judicial estoppel.

## IV.    Findings of fact

### A.    The Linda Flood Suit

In 1986, Mr. and Mrs. Schuette filed a claim against the State of California in the amount of $489,500.00 for damage to a parcel of real property they owned near Linda, California, resulting from flooding that occurred after a levee failed.  Shortly thereafter, the Schuettes and approximately 3,000 other claimants became plaintiffs in an action commenced in Yuba County, California, that was known as the "Linda Flood Suit."  Mr. Schuette was a reluctant litigant, as he was a member of the reclamation district's board that was responsible for monitoring and maintaining the levee, and the district itself was a

managed and disposed of the properties on National's behalf, and all net proceeds were paid to National.  National credited the Judgment as if the properties were conveyed to National, however.  Hereinafter, no distinction will be made between National and CDW, LLC, and the Court will refer to either or both of them as "National."

defendant in the Linda Flood Suit.  At the first trial of the Linda Flood Suit, Mr. Schuette gave testimony about the actions taken by levee district in responding to the threat of a levee failure.  He did not attend the remainder of the trial, which lasted several months.  The trial resulted in a plaintiffs' verdict, but in May 1992, the State filed an appeal.  <u>See</u> Plaintiff's Exhibit 4.  In August 1999, the appellate court vacated the plaintiffs' verdict and remanded the case back to the trial court.  At some point thereafter, the matter was tried and appealed again, and in December 2004, the plaintiffs' attorneys commenced settlement negotiations with the State.  <u>See</u> Plaintiff's Exhibits 7, 8 and 9.  The plaintiffs' attorneys ultimately obtained a gross settlement of over $216 million, of which the Schuettes' share, net of fees and expenses, was in excess of $1.6 million.  <u>See</u> Plaintiff's Exhibit 12.  On September 15, 2005, Mr. Schuette received settlement funds in the amount of $1,641,481.08, and in February 15, 2006, he received an additional $2,343.51.

B.    <u>The Judgment</u>

Before and after the flood, the Schuettes owned various investment properties in California.  In 1992, Mr. and Mrs. Schuette sold most of their California real property and moved to Oklahoma, where they purchased a number of investment properties through a Section 1031 exchange.  One of the California properties that was sold, a 35 unit apartment complex, was encumbered by and subject to a mortgage to San Pedro Bank.  Although the purchaser apparently had agreed to take over payments on the note secured by the mortgage, Mr. and Mrs. Schuette remained liable on the note, and when the purchaser (or his assignee) defaulted, San Pedro Bank foreclosed and obtained the Judgment against Mr. and Mrs.

Schuette and their trust in the amount of the deficiency.[3]  San Pedro Bank assigned the Judgment to National,[4] who domesticated the Judgment in Oklahoma in 1999.

C.     National's Collection Efforts

From February 2000 to March 2001, Mr. Schuette appeared at eleven asset hearings conducted by National, at which Mr. Schuette provided National with documentation of his assets, liabilities, income and expenses.  At the asset hearing on February 25, 2000, Mr. Schuette produced a document entitled "Frank R. Schuette Property Schedule As of December 31, 1999" (Defendant's Exhibit 8 (the "Property Schedule")), which purports to be an itemization of all real property owned by Mr. and/or Mrs. Schuette and/or their trust as of the end of 1999 (except for Mr. Schuette's personal residence).[5]  The Property Schedule includes 102 parcels of real property and reflects the year each property (or, in some cases, a discrete group of properties) was purchased, as well as the property's cost, accumulated depreciation, basis, fair market value, encumbrances, estimated net equity, and estimated taxable gain or loss if sold for fair market value.  At the asset hearing, Mr. Schuette testified that the schedule reflected what he believed was the "fair market value" of the properties as

---

[3]The Judgment was affirmed on appeal in September 2002.  See Defendant's Exhibit 32.

[4]San Pedro Bank actually assigned the Judgment to National Mortgage Company, National's predecessor in interest, but the parties have agreed that actions of National's predecessor in interest should be considered actions of National for the purposes of this litigation.  Pretrial Order at ¶ III(2).

[5]The Property Schedule omits two secured promissory notes held by the Schuettes, which are known by the parties as the Gallagher Note and the Murillo Note.  It also omits tangible personal property not related to Mr. Schuette's real estate investment business.

of December 31, 1999.  Transcript of Asset Hearing, Defendant's Exhibit 7, at 104-05.[6]  Mr. Schuette also testified that his accountant had prepared the document so he could ascertain the tax consequences of allowing "someone to take my property" as compared with the tax consequences of filing bankruptcy.  Transcript at 105-06.  At that time, Mrs. Schuette had filed a petition seeking a divorce from Mr. Schuette, and Mr. Schuette also sought to estimate his tax liability if the properties had to be liquidated under the terms of a divorce settlement or decree.

In March 2000, National obtained a receivership over the Schuettes' non-exempt real property.  Thereafter, Mrs. Schuette's divorce lawyer contacted National's agent, David Wolf, about negotiating a release of Mrs. Schuette from the Judgment.  Mr. Wolf advised that if Mrs. Schuette could obtain control of the properties, National would attempt to structure a settlement in which National would acquire some of the properties and Mrs. Schuette would be allowed to retain both a residence and some rental properties with which to generate income.  Although it is not clear who actually requested Mr. Schuette to relinquish control of the properties to Mrs. Schuette (*i.e.*, Mrs. Schuette, her attorney, a representative

---

[6]At the asset hearing, Mr. Schuette was questioned about the Property Schedule as follows:

Q:    Does [the Property Schedule] show or does it reflect the value of the properties, what you believe the present value of the properties–or pardon me, the value as of December 31, 1999?
A:    That is correct.
Q:    Okay.  Where does it show that?
A:    It will say "fair market value."

Transcript at 104-05.

of National or its attorneys), on May 23, 2000, Mr. Schuette conveyed his interest in all the properties listed on the Property Schedule and his interest in the Murillo and Gallagher Notes to Mrs. Schuette.[7]  See Plaintiff's Exhibit 37; Defendant's Exhibit 31-12B and C.

On July 27, 2000, National and Mrs. Schuette entered into a Settlement Agreement (Defendant's Exhibit 9-1) in which Mrs. Schuette agreed, among other things, to (1) convey selected rental properties and the Gallagher Note to National; (2) execute a $15,000 note to National secured by a mortgage; (3) dismiss her appeal of the Judgment; and (4) pay National the net proceeds from her pending sale of sixty-six rental houses in North Tulsa.  In exchange, National agreed to release its judgment lien on various properties that Mrs. Schuette was retaining and to forebear from executing on the Judgment against Mrs. Schuette so long as Mrs. Schuette fully performed her obligations under the agreement.  In addition, National agreed to apply a $600,000.00 credit against the Judgment in exchange for the transfer of the selected rental properties and the Gallagher Note to National.  National also separately entered a $218,825.78 credit against the Judgment, which was the amount of the actual net proceeds National received from Mrs. Schuette's sale of the sixty-six North Tulsa rental houses.

Mr. Schuette was not a party to the Settlement Agreement and National expressly reserved its right to continue pursuing collection of the Judgment against Mr. Schuette.

---

[7]The conveyances were prepared by National's attorneys and the closing of the transaction occurred at the offices of National's attorneys.  It appears that Mr. Schuette was not represented by counsel in connection with this transaction.

D.      The Purported Oral Agreement to Release the Judgment

Mr. Schuette contends that in March 2000, Mr. Wolf, on behalf of National, orally agreed to release the Judgment against him if Mr. Schuette conveyed his interest in all his investment properties to Mrs. Schuette (with the understanding that Mrs. Schuette would thereafter convey certain properties to National).  However, Mr. Schuette did not establish with admissible evidence that such an oral agreement existed.  Mr. Schuette's own testimony concerning the purported agreement was vague and failed to establish the elements of an enforceable contract.  Apparently, Mr. Schuette and Mr. Wolf had discussions regarding finding an efficient mechanism to pay the Judgment using the equity in the Schuettes' properties, and Mr. Schuette agreed to convey his interest in the properties to Mrs. Schuette as a first step, because, he testified, it would be easier for National to deal with Mrs. Schuette.

Mr. Schuette did not testify that Mr. Wolf actually agreed to cause National to release the Judgment against Mr. Schuette in exchange for Mr. Schuette's agreement to convey the properties to Mrs. Schuette.  At most, the Court finds that because Mr. Schuette believed that the properties he relinquished at the urging of National were worth in excess of $6 million, far greater than the amount due on the Judgment, it was his impression that National would release the Judgment as paid in full once the properties were conveyed to National.  Although Mr. Schuette was naive in failing to obtain a commitment from National concerning the value he expected to be applied against the Judgment for each of the properties National ultimately obtained, the evidence simply does not support the creation of the oral contract alleged by Mr. Schuette.

10

In any event, on March 1, 2000, prior to the alleged oral agreement, Mr. Wolf and Mr. Schuette entered into a written agreement acknowledging that

> there can be no settlement until it is in writing and signed by [Mr. Schuette] and National.  Everything else is just settlement discussions exploring various options and nothing will be binding until written and signed.  This way there will be no misunderstandings.

Defendant's Exhibits 12 and 13.  Thereafter on March 1, 2000, Mr. Schuette faxed a letter to Mr. Wolf proposing to pay $200,000.00 in settlement of the Judgment over a period of two years, which would be funded by selling property.  Defendant's Exhibit 11.  There is no evidence that National accepted Mr. Schuette's written offer and no evidence of any further written settlement offers or agreements between National and Mr. Schuette.

### E.   Value of Schuette properties conveyed to National or its affiliates

In its Proof of Claim, National asserts an unsecured claim of $590,834.77.  The original principal balance of the Judgment was $1,181,260.10.  The attachment to the Proof of Claim purports to be an accounting of the credits given and additional charges added to the Judgment.   The accounting indicates credits to the Judgment in the amounts of $28,373.14, which was obtained through four writs of execution; $218,825.78, which reflects the net proceeds of the sale of the North Tulsa rental houses; and $600,000.00, which was credited in exchange for the conveyance of properties to National by Mrs. Schuette pursuant to the Settlement Agreement.   The attachment also accounts for charges added to the Judgment in the amounts of $4,000.00 for management fees; $66,667.72 to settle accounts with the receiver; and $3,181.50 for recording fees.  The accounting also indicates the

accrual of interest on the Judgment.  The difference between the total due under the accounting (*i.e.*, $505,072.27 as of October 27, 2000) and the amount of the Proof of Claim (*i.e.*, $590,834.77) appears to be interest accrued between October 27, 2000 and the petition date.

The only element of the accounting that Mr. Schuette disputes is the $600,000.00 credit given in exchange for the properties conveyed by Mrs. Schuette to National.  See Plaintiff's Post-Trial Brief, ¶ 75.  Because Mr. Schuette was not a party to the Settlement Agreement, he is not bound by Mrs. Schuette's stipulation that the Judgment would be reduced by $600,000.00 in consideration for the transfer of certain of the Schuette properties. Accordingly, the Court must determine the amount of credit to which Mr. Schuette is entitled in exchange for the properties conveyed to National.[8]

The properties arguably relevant to the disputed $600,000.00 credit are described by the parties as follows:

Property No. 2:[9]  Lincoln/Orleans apartments in Sand Springs (14 units)

Property No. 3: Cincinnati Commercial Center at 6132-36 North Cincinnati, Tulsa

---

[8]Unfortunately, neither the Schuettes nor representatives of National obtained expert appraisals of the properties at or near the time they were transferred to National for credit against the Judgment.  In its Proof of Claim, National asserted that the collective value of the properties it received was $600,000.00, which, pursuant to Bankruptcy Rule 3001(f), constitutes *prima facie* evidence of the calculation of the amount of the claim, and shifts the burden of coming forward with evidence rebutting the $600,000.00 credit to Mr. Schuette.

[9]The parties stipulate that National separately credited $218,825.78 to the Judgment in exchange for Property No. 1, which consisted of the sixty-six rental houses in North Tulsa, and no additional evidence as to the value of those properties was admitted at trial.  See Pretrial Order at ¶ 19(a).  Accordingly, the disputed $600,000.00 credit does not involve Property No. 1.

Property No. 4: Brentwood apartments in Owasso (18 units)

Property No. 5: Stonegate duplexes and four-plexes in Owasso (40 units)

Property No. 6: Duplexes on Vancouver Ave. in southwest Tulsa (14 duplexes)[10]

Property No. 7: Gallagher Note and Deed of Trust

Property No. 8: 13th Street house in Marysville, California

Property No. 9: Gledhill/Olivehurst Properties in Marysville, California

Property No. 10: C Street house in Marysville, California

Property No. 11: Hill Road Property in Loma Rica, California

Property No. 12: Murillo Note and Deed of Trust

      1.    *Undisputed values and credits*

Mr. Schuette stipulates that with respect to certain properties, the amount of net proceeds National realized from the subsequent sale of the property (after deducting mortgages, closing costs, and additional expenses payable from the proceeds) constitutes a proper and reasonable amount of credit against the Judgment. See Pretrial Order at ¶ 19; Plaintiff's Post-Trial Brief at ¶¶ 85-86. Thus, the Court finds that the following amounts should be credited against the amount due on the Judgment in consideration for the conveyance of the following properties:

Property No. 3, the Cincinnati Commercial Center: $22,099.66

---

[10]Property No. 6 is described in some of the parties' documents (and on the Pretrial Order) as the "Owasso Properties." However, according to the legal descriptions, the duplexes are actually located in southwest Tulsa on South Vancouver West Avenue between 57th and 58th Street.

Property No. 4, the Brentwood apartments in Owasso: $63,183.29[11]

Property No. 7, the Gallagher Note: $33,943.00

Property No. 8, the 13th Street house in Marysville, California: $24,820.44

Property No. 10, the C Street house in Marysville, California: $0.00

Property No. 11, the Hill Road Property in Loma Rica, California: $0.00

The sum of all stipulated credits is $144,046.39.

### 2. *Property No. 2*

The parties stipulate that National received net cash at the closing of the sale of

Property No. 2 (the Lincoln/Orleans apartments) of $99,784.41. See Pretrial Order at ¶

---

[11]Property No. 4, Property No. 5 and a rental house in Owasso (which was also conveyed to National but was not listed on the Pretrial Order, hereinafter called the "Rental House") were all encumbered by a single mortgage securing a debt owed to the Vines Family Revocable Trust (the "Vines Mortgage"). The principal balance due at the time National acquired the properties (in July 2000) was approximately $398,000.00. On February 1, 2001, National deeded the Rental House to the Vines in exchange for a $45,000.00 reduction in the principal balance. See Defendant's Exhibit 31-5F. On May 21, 2001, National sold Property No. 4, taking a note and second mortgage; the Vines Mortgage against Property No. 4 was not released at closing. On January 2, 2002, National paid in full the debt secured by the Vines Mortgage, and the Vines Mortgage against all three properties was released. See Plaintiff's Exhibit 47.

In its own books and records, National allocated $45,000.00 of the mortgage indebtedness to the Rental House, $100,000.00 of the indebtedness to Property No. 4, and the remainder to Property No. 5. Mr. Schuette disputes National's allocation of $100,000.00 to Property No. 4 (apparently contending that the debt against Property No. 5 should be increased by $100,000.00), and claims that the sale of Property No. 4 resulted in net proceeds of $163,183.29 rather than $63,183.29. Because National owned all three properties encumbered by the Vines Mortgage, and National ultimately paid the entire balance of the Vines Mortgage, National was entitled to deduct the entire mortgage debt from the proceeds of the sale of the three properties to determine net proceeds to National. The manner in which National allocated the debt among the three properties is not material to the ultimate calculation of the credit due to Mr. Schuette. The Court adopts National's allocation of the debt in determining net proceeds from the sales of these properties.

19(b);  Plaintiff's Post-Trial Brief at ¶ 86.  National contends that any credit against the Judgment should be reduced by the repair costs paid by National prior to the sale of the property.

The Court agrees that the value of the property at the time it was conveyed to National (in July 2000) was *lower* than the amount National realized from its subsequent sale because the ultimate sales price reflected National's post-acquisition repairs and refurbishments. Barbara Longwith, a certified property manager with substantial experience managing multi-family properties, including those eligible for Section 8 subsidies,[12] was retained by National to manage several of the properties that the Schuettes conveyed to National (specifically Property Nos. 2, 3, 4 and 5).  Ms. Longwith observed that as of August 2000, the Lincoln/Orleans apartments were in "terrible condition"; that the occupancy rate was approximately 65%; that in many of the units, appliances, carpets and window coverings were missing; that metal staircases were crumbling and roofs leaked; that the heat and air conditioning systems were unreliable; that the units were infested with roaches; and that substantial repairs, refurbishment, extermination, and debris removal were necessary to bring the units to Section 8 occupancy standards.  National's former vice president, Robert Stevenson, and its agent, David Wolf, both of whom were involved in negotiating the acquisition and disposal of the Schuette properties for National, provided credible testimony

---

[12]The Housing Choice Voucher Program, established by Section 8 of the United States Housing Act of 1937 (42 U.S.C. § 1437f) and popularly known as "Section 8," is a federal housing program funded through the Department of Housing and Urban Development and administered by local public housing authorities.  Section 8 provides rent subsidy vouchers to qualified low income applicants, who then may exchange the vouchers for partial rent in any housing that qualifies for and accepts Section 8 tenants.

at trial that corroborated Ms. Longwith's assessment of the condition of the property. National established that it paid $25,094.00 in repair/refurbishment costs prior to selling the property.  See Defendant's Exhibit 31-2A and 31-2B.

Although the Court recognizes that the cost of repairing or refurbishing a property does not necessarily result in a dollar for dollar increase in the value of that property, the Court nevertheless finds from the evidence presented, and in the absence of an expert appraisal, that the value of the Lincoln/Orleans apartments as of July 2000 should be calculated by subtracting from the stipulated net sales revenue ($99,784.41) the expenditures that were reasonably and necessarily made to render the property marketable and to obtain the highest price.[13]  Ms. Longwith and Mr. Wolf provided credible testimony that National's expenditure of $25,094.00 was both reasonable and necessary.  Accordingly, the Court finds that in exchange for the conveyance of the Lincoln/Orleans apartments to National, Mr. Schuette is entitled to a credit against the Judgment in the amount of $74,691.41.

3.    Property No. 5

Property No. 5 is a complex of duplexes and four-plexes situated in Owasso, Oklahoma, containing forty rental units.  The property is now known as the Stonegate Apartments ("Stonegate").  In July 2000, when National obtained title to Stonegate, the property was encumbered by the Vines Mortgage, which had a principal balance of approximately $398,000.00.  Mr. Schuette testified that he believed that he could have sold

---

[13]Ms. Longwith, who was also a mortgage broker, testified that unless the deficiencies in the occupancy standards she described were remedied, it was not likely that a prospective buyer would have been able to obtain financing to purchase the property.

Stonegate, as is, for $900,000.00 to $1,100,000.00 in 2000, resulting in net proceeds of between $500,000.00 and $700,000.00. He believed the property to be in excellent condition and to be fully leased by tenants with jobs, and he did not believe a major renovation was required in order to make the property marketable.

Mr. Schuette's opinion that his properties were in excellent condition and were fully leased at the time they were transferred to National is not credible, however. Mr. Schuette acquired Property No. 5 through an agent, sight unseen, in 1992. He testified that he did not need to look at the property to determine whether he wanted to buy it; he relied on representations regarding cash flow to determine how much he was willing to pay for the property. Mr. Schuette further testified that after suffering a heart attack in 1993, he delegated the day-to-day management of his investment properties to his son and that he employed his brother to maintain and repair the properties. Mr. Schuette testified that he worked from his home paying bills as they came due, and that he checked up on his son and daughter (who managed other businesses financed by Mr. Schuette) a few times a week to "make sure they were working." After recovering from open heart surgery in 1996, Mr. Schuette entered a deaconate program with the Catholic Church, which he maintained until 1999. In 1999 and 2000, Mr. Schuette testified that he was mainly occupied with his divorce from Mrs. Schuette and responding to National's collection efforts.

Because Mr. Schuette had delegated leasing, management, and maintenance of the properties to his son and brother in 1993, the Court finds that Mr. Schuette did not have actual personal knowledge of the physical condition or occupancy status of the property at

the relevant time.[14]  In any case, Ms. Longwith's and Mr. Wolf's testimony regarding the condition and occupancy of the property as of July and August 2000 discredited Mr. Schuette's optimistic estimation of its fair market value as of that date.

The Court is aware that the properties were managed by a receiver from February 2000 to July 2000, but there was no evidence that the significant deterioration in the condition of the property described by Ms. Longwith and Mr. Wolf occurred during that time period.

On May 1, 2000, prior to National acquiring the Stonegate Apartments, the receiver obtained an offer from Alan Oxford to purchase the three properties encumbered by the Vines Mortgage, *i.e.*, Stonegate (Property No. 5), Brentwood (Property No. 4), and a house at 104 West 4th Street, Owasso, for a total $500,000.00.  See Defendant's Exhibit 31-5G. The offeror proposed that he would assume the Vines Mortgage in the amount of $398,000.00 and issue a note to the seller in the amount of $102,000.00 payable over two years, secured by a second mortgage on the property.  On June 7, 2000, again, prior to National acquiring the property, the receiver obtained an offer from David Charney to purchase the three properties encumbered by the Vines Mortgage for $518,000.00, which would have resulted in approximately $120,000.00 in proceeds (less closing costs) for the three properties.  These two offers present some evidence that the cumulative net value of the three properties was between $100,000.00 and $120,000.00.

---

[14]It appears that maintenance was performed solely to address deficiencies found by the Tulsa Housing Authority that were required to be remedied in order to qualify a unit for Section 8-subsidized tenants.

On July 28, 2000, Mrs. Schuette conveyed Stonegate to National, and Ms. Longwith was engaged to lease and manage Stonegate on National's behalf.  Ms. Longwith testified that the property's condition at that time was "very poor"; it had an occupancy rate of about 50%, with only 25% under lease; the tenants living in the units were not necessarily the lessees of record; the leasing records were inaccurate; the Tulsa Housing Authority refused to pay its rent subsidy because units did not comply with Section 8 standards for habitability; rock was falling off the exterior of the buildings; there was significant water damage from leaky roofs, leaky plumbing and the missing windows; every unit was infested with termites and roaches; almost every unit had at least one appliance missing; in all but two units, all carpeting needed to be replaced; and in some units, countertops and cabinets had been removed.  National invested some money immediately to fix doors and windows and change locks in order to secure the property, and to make some minor repairs and improvements to render some units leasable.  Ms. Longwith continued to collect rents from the existing tenants and attempted to lease other units as they became habitable.  She stated that it was very difficult to lease the units because of their poor condition and the poor reputation of the complex.  For marketing purposes, Ms. Longwith gave the property the name "Stonegate."

In July 2001, National hired Haycra Design ("Haycra") as its general contractor to renovate Stonegate in order to attract tenants and justify higher rents.  John Cram, a principal of Haycra, oversaw the renovation.  Haycra began the renovation on July 10, 2001.  Mr. Cram concurred with Ms. Longwith's testimony regarding the extent of deterioration of the property.

On September 28, 2001, in connection with National's application to borrow funds in order to pay off the Vines Mortgage and finance the renovation of Stonegate, Commercial Federal Bank engaged William Knight, a certified appraiser, to prepare an appraisal report for Stonegate.  Subject to the completion of the planned renovations and improvements (which Haycra had originally estimated would cost approximately $403,879.00)[15] and subject to the property being fully leased, and using the income and sales comparison approaches, Mr. Knight settled on a prospective value of $1.2 million.  In connection with his appraisal, Mr. Knight had viewed the interior of only one building, which was the building that had already been renovated, and he did not go into any apartments that had not been renovated. He had "no idea" what the property was worth when National took title to the property or what the property was worth without the projected renovation.[16]

At the request of National's counsel, Mr. Knight calculated a value of Stonegate under the income approach (specifically the direct capitalization method, or value = net operating

_____

[15]Mr. Knight was provided with what appears to be a marketing flyer describing the features of the fully renovated Stonegate, which included new appliances, new central heat and air, new carpeting and vinyl, new fixtures, new miniblinds, new roof, new exterior siding and paint, new landscaping, and a new onsite laundry facility.  See Plaintiff's Exhibit 69 (page 7).  Mr. Knight was advised that the renovation would be finished by February 2002. Because the renovation required more extensive structural work than anticipated, however, it was not completed until December 2002.

[16]During the trial, the Court reserved its ruling on National's objection to the admission of the appraisal report prepared by Mr. Knight in September 2001, which was offered as Plaintiff's Exhibit 42 as supplemented by Plaintiff's Exhibit 69.  The report is admitted, but the Court gives the appraised value set forth therein no weight because the report reflected a projected value based upon the completion of a significant and expensive renovation of the property.

income/capitalization rate), using the actual net operating income from Stonegate that Mr. Schuette reported on his 1999 federal income tax returns (adjusted to add back depreciation and interest). See Plaintiff's Exhibit 23. Using a 10.75% capitalization rate[17] on reported net operating income of $47,254.00, Mr. Knight calculated a value of roughly $440,000.00. Using a 12% capitalization rate[18] on the same net operating income (as adjusted) resulted in a value of approximately $395,000.00.  Even if Mr. Schuette's actual net operating income was increased by $20,000.00 per year to $67,254.00 (by reducing the management fee Mr. Schuette claimed on his 1999 tax return by $20,000.00), the income analysis produced values of $625,000.00 (at a 10.75% cap rate) and $560,000.00 (at a 12% cap rate).

Finally, in his report, Mr. Knight indicated that for *ad valorem* tax purposes, Tulsa County appraised the property at $773,200.00.  However, he testified that the county generally reappraises property for *ad valorem* purposes when it is sold on the market, and because such an appraisal reflects the actual sales price, a county's appraised value is most accurate in the year after a sale.  He also stated that a county's appraised value does not necessarily accurately track increases or decreases in fair market value in subsequent years. Mr. Schuette purchased the property in 1992.  The property was transferred to Mrs. Schuette in May 2000 and to National in July 2000, but neither party presented evidence regarding

---

[17]In his September 2001 appraisal report, Mr. Knight chose a 10.75% rate to apply to Stonegate's projected net operating income in performing his income approach valuation analysis.

[18]National's counsel chose a 12% rate for comparison because the prime rate at the time National acquired Stonegate (July 2000) was higher than the prime rate in effect at the time of Mr. Knight's appraisal (September 2001).

whether the property was revalued by the county in 2000, and if so, on what basis the county derived its value.[19]  In light of the more persuasive evidence of value presented by National, the Court gives minimal weight to the county's appraised value.

On January 30, 2002, Commercial Bank issued National a line of credit, secured by Stonegate, upon which National eventually drew $684,778.00.  National applied some of the proceeds to pay off $238,686.00 of the debt secured by the Vines Mortgage,[20] resulting in net cash from the refinance of Stonegate of approximately $446,092.00.   National used these proceeds to finance Haycra's renovation of Stonegate.  Plaintiff's Exhibit 54; Defendant's Exhibit 31-5A.

In December 2002, Haycra completed the renovation of Stonegate.  From July 2000 to December 2002, National expended $792,810.00 preparing Stonegate for sale.  This figure includes $751,059.00 paid to Haycra, approximately $20,000.00 in fees associated with the Commercial Federal Bank loan, and approximately $22,000.00 for services, materials or furnishings not provided by or obtained through Haycra.

On August 23, 2003, National sold Stonegate to Dant Properties LLC for $1,150,000.00, which, after satisfying Commercial Federal Bank's mortgage and paying closing costs, resulted in net proceeds of $469,254.00.  See Defendant's Exhibit 31-5D.

---

[19]The Court notes that Mrs. Schuette transferred all the properties located in Tulsa County to National in one Warranty Deed, which deed recites consideration of  "Ten Dollars and other good and valuable consideration."  See Plaintiff's Exhibit 40.

[20]On January 30, 2002, the balance of the Vines Mortgage was $338,686.00, but National allocated $100,000.00 of the debt to calculating the net proceeds from the sale of Property No. 4, the Brentwood apartments.

Thus, together with the net proceeds received from Commercial Federal Bank, National received $915,345.00 from the refinancing and sale of Stonegate. However, because National spent $792,810.00, which the Court finds was reasonably and necessarily spent in order to render the property marketable, National realized $122,535.00 from Stonegate.

Mr. Schuette contends that either National did not actually incur the expenses it claims in renovating Stonegate or that it overpaid for the renovations, and that it should only be allowed to deduct $403,879.00, if anything, from its net sales proceeds, because that was Haycra's original estimate of the cost of the renovation. See Plaintiff's Exhibit 69 (page 3). Mr. Cram testified, however, that as the roof and walls were dismantled, it became clear that extensive reconstruction, which he had not envisioned when rendering his estimate, would be necessary. Studs had been rotted by water and eaten by termites to a stage where the wood was crumbling, which required a complete reframing of the exterior walls. Some interior studs also had to be replaced. The interior walls were made of 1/8 inch veneer paneling nailed to studs, rather than sheetrock (38 of the 40 units required the installation of sheetrock) and very few walls contained insulation. Because the existing wiring did not meet building code standards, a complete rewiring of the property was required. Ninety percent of the plumbing had to be replaced, and all units needed new hot water heaters. Built-in cabinets were in poor shape, and under sink cabinets were water-damaged. The roofs were multi-layered, and some units had five layers of shingles which had overloaded the roof trusses. In addition to some trusses, all the decking, shingles, endcaps, soffits, fascia boards and guttering had to be replaced. Significant site work was required to drain water away

23

from the sidewalks and the buildings; the absence of proper drainage contributed to the dry rot damage and termite infestation of the property.  Some of the stone exterior had been damaged by vehicles and needed repair. Seventy-five percent of the parking lot was replaced. The existing units each had one window air conditioner in the living room and baseboard heat; Haycra installed central heat and air conditioning in each.

In comparing Haycra's cost estimate (Plaintiff's Exhibit 69 (page 3)) with its actual cost report (Defendant's Exhibit 31-5B), the actual costs were significantly higher (*i.e.*, more than a $10,000 difference, and in many cases, more than a $35,000 difference) than the estimated costs in the categories of cabinets and countertops, carpentry, carpet and vinyl, central air conditioning, demolition, electrical, interior doors, interior paint, plumbing, sheetrock, site work, and Haycra's contracting fee.  Mr. Cram explained the reasons for increased costs in those areas, and the Court found Mr. Cram's testimony credible and valuable.

National's net recovery of $122,535.00 was more than the net cash National (or the receiver on National's behalf) would have realized if it had accepted either of the two offers made by two separate individuals in mid-2000 for all three properties encumbered by the Vines Mortgage, *i.e.*, Stonegate, Brentwood and the Rental House, in their unrenovated conditions.  Therefore, the Court finds that $122,535.00 represents a reasonable amount of credit against the Judgment in exchange for Stonegate.

4.      *Property No. 6*

Property No. 6 consists of fourteen duplexes on Vancouver Avenue in southwest Tulsa.  According to the Property Schedule (Defendant's Exhibit 8), Mr. Schuette acquired Property No. 6 in 1992 for $565,656.00.  Mr. Schuette described the duplexes as quality units in excellent condition.  In 1997, Mr. Schuette borrowed approximately $844,000.00 and secured the debt with Property No. 6.  In December 1999, the principal balance of the debt was approximately $835,000.00.  Mr. Schuette claims that because the bank was willing to loan him 80% of the value of Property No. 6, and the original loan was $844,000.00, the bank must have believed the value of Property No. 6 was approximately $1,050,000.00.  However, the Property Schedule prepared by Mr. Schuette's accountant estimating the tax consequences of disposing of the property as of December 31, 1999, estimated a fair market value of $966,000.00.

Mr. Wolf testified that at the time National obtained title to Property No. 6, the mortgage was several months in arrears and the mortgagee was preparing to foreclose, but the receiver had fortunately identified a potential buyer for the property.  In determining a sales price, Mr. Wolf evaluated the following facts: The property was encumbered by a mortgage with a principal balance of $834,349.00, accrued interest from three unpaid mortgage payments of approximately $23,726.00, late fees of $1,788.00, and unpaid ad valorem taxes of approximately $23,100.00, and to close, National would have to pay an estimated $10,150.00 in abstracting costs, resulting in a total of *at least* $889,663.00 that would have to be paid from the purchase price.  Mr. Wolf performed a rough income analysis

using two different rent scenarios, which resulted in a range of values of $796,923.00 to $1,055,384.61.  He also calculated a potential price by assigning a value of $70,000.00 to each of the fourteen duplexes, which resulted in a value of $980,000.00.

Mr. Wolf obtained authority from Mr. Stevenson to convey the property for $50,000.00 cash, with the purchaser assuming the cost of all repairs, encumbrances, taxes, commissions and closing costs.  In late July, 2000, National did in fact sell Property No. 6 to an unaffiliated purchaser under these terms.  Thus, based on the known costs that would have to be paid at closing, the actual sales price was at a minimum, $940,000.00 ($50,000.00 plus at least $890,000.00 in assumed liabilities).

The Court finds that the actual sales price for Property No. 6 is within the range of the various values offered at trial, and without an expert appraisal, the Court is not in a position to find that the actual sales price obtained at or near the date National acquired the property did not reflect fair market value of the property at that time.

5.      Property No. 9

Property No. 9 consists of two rental houses located in Maryville, California, one on Olivehurst Avenue and one on Gledhill Road.  Both properties were encumbered by the same deed of trust that secured a debt to Beneficial Finance.

On May 1, 2001, National sold the Olivehurst property for $54,000.00, which after closing costs were paid, resulted in National realizing $48,945.00, consisting of a note from the purchaser in the amount of $47,760.00 and cash of $1,185.00.  National agreed to make the installment payments on the Beneficial Finance debt pending the sale of the Gledhill

property, at which time National would pay the Beneficial Finance debt in full and obtain a release of the deed of trust on both properties.  <u>See</u> Defendant's Exhibit 31-9A and B; Pretrial Order at ¶ 19(h).

On December 28, 2001, National sold the Gledhill property for $40,000.00.  <u>Id</u>.  On March 19, 2002, National paid Beneficial Finance $71,660.00, which included a prepayment penalty.  <u>Id</u>.  On April 1, 2002, Beneficial Finance refunded a portion of the penalty, which National credited as $681.00 of additional proceeds.  <u>See</u> Plaintiff's Exhibit 62 and Defendant's Exhibit 31-9A.

In its Exhibit 31-9A, National represented that it installed a furnace in one of the properties prior to its sale.  However, there was no supporting testimony or documentary evidence with respect to that expense.

The Court finds that the actual sales price reflects the fair market value of Property No. 9 and from the sales, National realized net proceeds of $17,966.00, which the Court finds to be an appropriate credit against the Judgment in exchange for Property No. 9.

6.    Property No. 12

Mr. Schuette contends that by virtue of a court order, he conveyed to National the Murillo Note with a principal balance due of approximately $51,500.00, and therefore he is entitled to an additional credit against the Judgment in the amount of $51,500.00.  National argues that it should not be required to credit the Judgment for the Murillo Note because Mr. Schuette assigned that asset, with National's consent, to Mrs. Schuette, and National did not collect the Note or realize any benefit from the Murillo Note.

27

The evidence favors National's position.  On March 10, 2000, Mr. Schuette was ordered by the Tulsa County District Court to turn over to National the Gallagher Note (Property No. 7) and the Murillo Note, and if the documents could not be located, Mr. Schuette was to file an affidavit to that effect.  Order for Turnover, Transfer, and Assignment ("Order"), Defendant's Exhibit 31-12A.  The court further held that the Order "shall serve as an instrument of assignment of all: (a) notes described hereinabove, (b) mortgages, deeds of trust or other security instruments relating thereto, and (c) any proceeds derived therefrom which pertain thereto." Order at 2.   The Order further provided that "[t]o the extent any value is received by the Judgment Creditor from the Notes or relative/supporting security instruments or their proceeds, the Judgment Creditor will report to the Court concerning the value received, and the Court will thereafter determine the extent of any partial reduction of the amount of the Judgment Creditors's judgment, if any is brought by or from the Notes or other property turned over."  Order at 3.

On May 17, 2000, Mr. Schuette, individually and as trustee of the Trust, executed an Assignment of Note and Deed of Trust ("Assignment"), assigning the Murillo Note to Mrs. Schuette.  Assignment, Exhibit 31-12B.  On May 19, 2000, National's counsel sent a letter to Mr. Schuette's counsel confirming that National "has agreed to allow your client, Mr. Schuette, to assign promissory notes and accompanying security documents to Mrs. Schuette

in lieu of the May 10, 2000 Order[21] entered by the Court in this case."  Defendant's Exhibit 31-12C.

On July 27, 2000, National entered into the Settlement Agreement with Mrs. Schuette. Settlement Agreement, Defendant's Exhibit 9-1.  The Settlement Agreement provided for the transfer of the Gallagher Note to National, but not the Murillo Note.  Id. at ¶ 1.2.  Because the Murillo Note was not conveyed to National, but was retained by Mrs. Schuette, National did not receive any value from the Murillo Note[22] and was not required to grant any credit against the Judgment on account of that asset.

7.     *Summary of value realized by National from Property Nos. 2-12*

Based upon the above findings, Mr. Schuette was entitled to a credit on the Judgment in the following amounts in exchange for the following properties:

| | |
|---|---|
| Property No. 2:  Lincoln/Orleans apartments | $74,691.41 |
| Property No. 3: Cincinnati Commercial Center | $22,099.66 |
| Property No. 4: Brentwood apartments | $63,183.29 |
| Property No. 5: Stonegate apartments | $122,535.00 |
| Property No. 6: Duplexes on Vancouver Ave. | $50,000.00 |
| Property No. 7: Gallagher Note and Deed of Trust | $33,943.00 |
| Property No. 8: 13th Street house in Marysville, CA | $24,820.44 |

---

[21]The letter erroneously refers to a May 10, 2000 Order.  The Order relating to the notes and deeds of trust was entered on March 10, 2000, not May 10, 2000.

[22]The Court notes that Mr. Schuette did not present any evidence whatsoever that National obtained any benefit from the Murillo Note.

| | |
|---|---|
| Property No. 9: Gledhill/Olivehurst Properties | $17,966.00 |
| Property No. 10: C Street house in Marysville, CA | $0.00 |
| Property No. 11: Hill Road Property | $0.00 |
| Property No. 12: Murillo Note and Deed of Trust | $0.00 |
| Total: | $409,238.80 [23] |

At trial, National also contended that in determining the value of Property Nos. 2-12, the Court should also deduct the net operating costs incurred by National between the date National took possession of the property and the date National sold the property. <u>See</u> Defendant's Exhibit 1, column G, and Defendant's Exhibit 1A. Because the Court finds that the cumulative value of Property Nos. 2-12 is already less than the $600,000.00 credit given in the Proof of Claim, the Court need not determine whether the value should be decreased further by the properties' net operating losses.

**V.      Conclusions of law**

National's Proof of Claim constitutes *prima facie* evidence of the validity and amount of its claim. Bankruptcy Rule 3001(f). Because the Court has found that the value of the properties conveyed to National did not exceed the $600,000.00 credit against the Judgment

---

[23]The Property Schedule, which was prepared by Mr. Schuette's accountant for the purpose of estimating Mr. Schuette's potential tax liability as of December 31, 1999, in the event all Mr. Schuette's investment properties were transferred for fair market value, estimated that the fair market value of the properties that were ultimately transferred to National was $465,481.00. <u>See</u> Defendant's Exhibits 1 and 8. Mr. Wolf relied on this schedule (as well as actual offers to purchase some or all of the properties from the receiver) when he determined that granting a $600,000.00 credit to the Judgment in exchange for the properties was fair and even generous. The Property Schedule further supports the Court's finding that the net value of the properties conveyed to National did not exceed $600,000.00.

that was given to Mr. Schuette in the Proof of Claim, Mr. Schuette has failed to rebut the presumptive validity and amount of the Proof of Claim.  In any event, even in the absence of a presumption, National has presented sufficient affirmative evidence to establish the reasonableness of the disputed $600,000.00 credit.  Accordingly, Mr. Schuette's objection to National's Proof of Claim must be denied.[24]  Furthermore, National has fully accounted for its application of the proceeds of the properties against the Judgment.

## VI.    Conclusion

Because the Court has found that (1) National did not orally agree to release the Judgment against Mr. Schuette and (2) the $600,000.00 credit against the Judgment in exchange for Property Nos. 2-12 was not insufficient, Mr. Schuette's objection to National's Proof of Claim must be denied.  A separate judgment will be entered contemporaneously herewith.

**SO ORDERED** this 17th day of February, 2009.

DANA L. RASURE
UNITED STATES BANKRUPTCY JUDGE

---

[24]Because Mr. Schuette's objection is denied on the merits, it is not necessary to resolve the numerous factual and legal issues relating to National's defenses, such as whether Mr. Schuette knowingly omitted the Linda Flood Suit from his original bankruptcy schedules and whether National established all the elements of any of its defenses.